Filed 9/29/14  P. v. Daniels CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B249088 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA347305) |
| v. | |
| BRANDON DANIELS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig J. Mitchell, Judge.  Affirmed with modifications and directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Daniels.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant Brandon Daniels appeals from the judgment entered against him following his conviction by jury of first degree murder (Pen. Code, § 187, subd. (a), count 1),[1] attempted second degree robbery (§§ 664, 211, count 2), and second degree commercial burglary (§ 459, count 3).  As to the murder charge, the jury found to be true the special circumstance allegation that it was committed in the course of committing an attempted robbery (§ 190.2, subd. (a)(17)).  As to all counts, the jury also found to be true the allegation that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)), and as to counts 1 and 2 the allegation that a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) & (e)).

Appellant was sentenced to life without the possibility of parole on count 1, plus a consecutive term of 25 years to life for the firearm allegation.  Pursuant to section 654, the court imposed and stayed sentence on counts 2 and 3.

Appellant contends:  (1) the trial court erred in admitting appellant's interrogation because the *Miranda*[2] admonition was invalid; (2) the trial court erred in admitting appellant's admissions because they were the product of coercion and promises; (3) the trial court erred in excluding portions of appellant's interrogation that showed his admissions were involuntary and unreliable; (4) the trial court erred by allowing a witness, who was not qualified, to offer expert testimony; (5) the prosecutor committed prejudicial misconduct; (6) there was insufficient evidence to support the "primary activities" element of the gang enhancement; and (7) the trial court improperly instructed the jury regarding the section 186.22 gang allegation.  Both appellant and the People agree that the abstract of judgment contains errors that should be corrected.  We direct the trial court to correct the errors in the abstract of judgment.  In all other respects, the judgment is affirmed.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

**Prosecution Case**

### Robbery and Homicide

Daniel Sosa, Martin Chavero,[4] and Matthews worked at La Brea Collective, a medical marijuana dispensary located at 812 South La Brea Avenue in Los Angeles. Noe Campos Gonzalez was an unarmed security guard at the dispensary. To enter the building, a person entered a "man trap" which was a secured room separated from the lobby. When patients knocked on the door, or rang the doorbell, they were allowed entry into the man trap, where they were met by Gonzalez. Upon proof of identification and a verified medical marijuana authorization, the patients were permitted to enter the dispensary through the lobby. There were several surveillance cameras focused on the front door, the man trap, and the lobby. The surveillance system was set up to monitor all activity in real time but did not record it for later viewing.

On October 1, 2008, at approximately 3:00 p.m., Chavero was standing behind the counter on the ground floor of the dispensary when the doorbell rang. Sosa walked towards Chavero and pointed to the back of the dispensary. Chavero looked at the monitor and saw Gonzalez being escorted into the lobby by two males armed with handguns. As Chavero turned away from the monitor he saw a third male kick down the door to the lobby. When Chavero heard Gonzalez say "Trucha," which he understood to mean "heads up," he followed Sosa and closed the safe, which was located at the back of the dispensary.

---

[3] Appellant's codefendants were identified as Leon Banks, Lovie Troy Matthews, and David Gardiner. Banks and Matthews were arrested on the day of the crimes, and Gardiner was arrested in July 2009. Banks and Matthews were tried together and their murder convictions were affirmed by this court on August 29, 2013. (*People v. Banks*, B236152.) They are not parties to this appeal.

[4] Chavero was known as Martin Garcia at the time of the incident and subsequently changed his name. We refer to him throughout as Chavero.

Matthew S. was assisting a patient in the upstairs loft area when he saw appellant jump over the counter in the lobby area. Matthew grabbed the patient and attempted to leave but threw himself to the ground when appellant ran up the stairs and pointed a gun at him. Matthew described appellant as an African-American male, of average build, having short, buzzed hair, and wearing a white shirt and blue pants. Appellant asked "Where's the shit at?" Matthew told him it was behind the bar area and to take whatever he wanted.

Banks grabbed Chavero by the shoulder and pulled him and Sosa to the front area of the dispensary. Chavero turned and looked at Banks. Banks told Chavero, "If you keep looking at me, I will kill you." Banks forced Chavero and Sosa to the ground, placed his knee on Chavero's back, and attempted to put a zip tie on Chavero's wrist. Chavero heard gunshots and Banks said, "Shit, we got to go, we got to go."

Chavero looked at the monitor and saw the three gunmen struggling to push their way out the front door. Gonzalez was outside preventing their exit from the man trap. There was a glass window to the side of the man trap and Chavero saw one of the gunmen come back inside the lobby area and fire some shots through the window. The three gunmen continued to push on the door and one managed to get his left arm through and shoot Gonzalez. The three gunmen were then able to push their way outside and Chavero heard additional gunshots.

James Hustead was at Massimo's Mudspot coffee shop located diagonally across the street from the dispensary when the shooting occurred. He heard a gunshot and looked up and saw Gonzalez standing outside pushing the metal security door closed, while it was being pushed open from the inside. Gonzalez reached his hand around the door to the inside. Hustead saw Banks reach his hand outside and shoot Gonzalez. As Gonzalez fell backwards, Banks stepped from behind the door and fired again at Gonzalez. The last shot fired by Banks hit Gonzalez in the head. Banks was the tallest of the three gunmen, Gardiner was short and wore his hair in cornrows. Appellant, Banks, and Gardiner ran northbound towards 8th Street and headed towards the alley behind the dispensary.

4

At approximately 3:45 p.m., Robert Simmons was driving southbound on La Brea Avenue between Wilshire and 9th Street. Simmons slowed down and looked to his left, where he saw two men pushing back and forth on a door. Both men had guns and were trying to reach around the door to shoot at each other. Simmons heard more gunshots and pulled over to the side. He walked back towards the dispensary and saw Gonzalez lying on the sidewalk.

Dominic Agbabiaka was standing on the sidewalk on South Sycamore Avenue about the middle of the block between 8th and 9th Streets. Appellant, who was running southbound on South Sycamore Avenue, crossed the street and asked Agbabiaka if he could use the restroom inside the house. Agbabiaka refused the request. Appellant appeared to be anxious. A gray SUV came around the corner from 9th Street. The SUV had paper license plates and was travelling at a fast speed for a residential street. As the SUV approached, appellant yelled, "Troy." The SUV slowed down and Agbabiaka saw appellant and Gardiner jump inside it.

### Police Investigation

Los Angeles Police Department (LAPD) Sergeant Elizabeth Karen Ellis responded to a robbery in progress call at La Brea Collective. Gonzalez was lying on the sidewalk. Officer Ellis recovered a .44-caliber revolver that was on the ground near Gonzalez's outstretched arm. The revolver contained three expended rounds and two live rounds.

LAPD Detective John Shafia responded to the crime scene at 5:05 p.m. He and other law enforcement officers located the following evidence: 10 spent nine-millimeter cartridge casings on the sidewalk; a lead bullet projectile in the lobby area to the left of the man trap; two zip ties locked together about two feet from the projectile; a second set of zip ties in the lobby area; projectile fragmentations on the dispensary's outdoor awning; a black leather glove, tennis shoes, clothing, and bloodstains on the sidewalk. LAPD Officer Javier Hernandez found a photocopy of a physician's statement and recommendation form for medical marijuana use. The document was by the door of the lobby area of the dispensary. The bottom of the statement contained a photocopy of a driver's license with a photograph of Banks.

5

Detective Shafia was informed that Banks had been detained at a location near 8th Street and South Orange Drive, less than two blocks from the dispensary. Further investigation determined that the gray SUV identified as the getaway vehicle was registered to Banks. Matthews was arrested later that same day driving the SUV. Matthews was on parole and was wearing an electronic monitoring device on his ankle. Based on tracking information from the device Matthews was wearing, Detective Shafia was able to track the movements of the SUV on the day of the shooting. A second gun, a semiautomatic handgun, was found along with some black plastic zip ties, a gun holster, and gloves, in the bamboo bushes near the front porch of a house on South Orange Drive.

Gonzalez sustained a fatal gunshot wound to his left temple and a second potentially fatal gunshot wound to his left shoulder. A bullet fragment was removed from Gonzalez's shoulder during the autopsy and booked into evidence.

### *Forensic Evidence*

Larry Peelen, a forensic print specialist with the LAPD, examined a print taken from the inside of the front metal security door. He testified that it matched a left palm print obtained from appellant. Peelen also examined the physician's statement found inside the dispensary and testified that one of the prints lifted from it matched Banks's print.

LAPD criminalist Fadil Biraimah conducted testing on the revolver, the expended casings found at the crime scene, and the semiautomatic handgun recovered from the bushes near the dispensary. The semiautomatic handgun was a nine-millimeter Glock, and Biraimah testified it was the weapon that fired the casings found at the dispensary. LAPD criminalist Michael Kelley testified that the fired bullet recovered from Gonzalez's body during the autopsy was fired from the nine-millimeter Glock recovered from the bushes near the dispensary.

The GPS device Matthews wore was unique to him and tracked his movement. Steven Reinhart, an expert in GPS systems, testified as to Matthews's movements on the day of the incident. At 3:15 p.m., the GPS showed Matthews at South Mansfield Avenue, approximately three blocks from the dispensary, where he remained for

6

approximately 30 minutes. At 3:46 p.m., Matthews traveled from South Mansfield Avenue to 9th Street, then proceeded north on South Sycamore Avenue, and onto 8th Street. The GPS showed Matthews made a number of other stops at various locations within a few blocks of the dispensary.

### *Gang Evidence*

LAPD Officer Ryan Marshall testified as a gang expert. He received general gang training at the academy and had worked on a gang-related task force with the ATF, and a joint task force related to gangs with the FBI. He had testified as a gang expert more than 60 times. He focused on the Rolling 30 Harlem Crips (Rolling 30's) and the Black P-Stones, which was a Blood gang. There were approximately 700 members of the Rolling 30's gang in 2008. The gang was originally called the Harlem Godfathers and later split into the Harlem Crips and the Rolling 30's. The primary activities of the Rolling 30's included narcotics sales, burglaries, robberies, "gang on gang" shootings, attempted murders, murders, and gun possession. Officer Marshall agreed that a "primary activity" meant something the gang did "a lot." Officer Marshall testified to the commission of two predicate crimes committed by members of the Rolling 30's. Harold Christopher Goff was convicted of burglary in 2007, and Jerry Tyronne Phillips was convicted of possession of a concealed weapon in 2007. Officer Marshall was personally familiar with both Goff and Phillips and both admitted to him that they were members of the Rolling 30's gang.

Officer Marshall testified that a person was expected to be "down for the gang" once he joined and could not opt out of activity when asked to participate. It was common for gang members to be armed and to commit crimes together. Gang members wanted someone they knew and trusted to participate in crimes with them and they were expected to back up each other when necessary. If a fight escalated to a shooting, the gang member with the gun would be expected to return fire.

Officer Marshall opined that appellant was a member of the Rolling 30's based on several factors. While working for the Southwest Gang Unit, Officer Marshall had had personal contact with appellant and detained him. Appellant self-admitted being a

7

member of the Rolling 30's and that his moniker was "Bronx." Appellant had numerous tattoos, including the letters "OHC" tattooed on his stomach, which stood for Original Harlem Crip, a "Harlem Love" tattoo on his chest and a "37" on his left arm, which indicated his particular clique within the Rolling 30's. Officer Marshall reviewed an arrest report that indicated that while appellant was detained on a traffic warrant he scratched "Rolling 30's" into the paint of the jail cell. Officer Marshall also had multiple contacts with Gardiner, whose moniker was "Little Bronx." The monikers for appellant and Gardiner indicated they had a "big homie, little homie relationship." Officer Marshall opined Gardiner was also a member of the Rolling 30's gang based on his gang tattoos and self-admission. Based on his investigation, Officer Marshall opined that Matthews was a member of the Rolling 30's gang in 2008, and that Banks was a Rolling 60's gang member.

Responding to a hypothetical question based on the facts of this case, Officer Marshall opined that the crimes were committed for the benefit of and in association with the Rolling 30's criminal street gang. The marijuana dispensary was a cash business that would yield money to aid the gang in recruitment. Such a violent act also gave status to the gang members who committed the crimes and to the gang itself and increased fear in the community for the Rolling 30's gang. Officer Marshall testified that the participants were working together and the crime exhibited planning. The gang members were armed and had in their possession a fraudulent authorization to obtain marijuana. Officer Marshall opined that a discussion took place among the gang members prior to the incident and all of the participants were aware of the criminal purpose of the venture.

*Appellant's Statement*

Appellant was arrested on March 6, 2010, at the home of his child's mother in the City of Inglewood. At the police station, appellant was read and waived his *Miranda* rights prior to being interviewed by Detective Shafia. The interview lasted approximately two hours and was recorded. Detective Shafia told appellant the evidence he had against him, including fingerprints and an eyewitness. He also told appellant that he had GPS information for Matthews and that the physician's statement recovered from

8

the crime scene contained Banks's palm print. Throughout the interview, Detective Shafia communicated that he believed appellant was a member of the Rolling 30's. Appellant never denied gang membership. Appellant told Detective Shafia that he did not want his case to go before a jury. Detective Shafia told appellant he would have to speak with his attorney and have appellant's attorney and the district attorney work out a deal.

Appellant said he knew Lovie Matthews and referred to him as "Troy." He also admitted he knew Gardiner. When Detective Shafia told appellant that his DNA had been found in Banks's car, appellant admitted he had been in the car and knew Banks was a friend of Matthews. Appellant identified Banks from the physician's statement containing Banks's photo. He acknowledged that he knew Banks was a Rolling 60's gang member.

Appellant stated that on the day of the shooting Matthews picked him up in Banks's SUV. They had a plan to "score some weed" from the marijuana dispensary. They drove to La Brea Collective in Banks's SUV and Matthews dropped them off in front of the dispensary. Appellant said he did not have a physician's statement to obtain the marijuana but he knew Banks would use a piece of paper to get into the clinic. Appellant stated the security guard let them enter the dispensary. Appellant went upstairs while Gardiner remained at the entrance with the security guard. When appellant heard a gunshot, he ran downstairs and talked to Banks. Appellant then saw Gardiner in the lobby and all three of them ran to the door to exit. They pushed on the door to open it and appellant heard the security guard call for help. Appellant stated the security guard reached in and fired a gun and Banks fired back in self-defense. All three of them ran outside and appellant called Matthews as he ran from the dispensary. Appellant stated that he and Gardiner met up with Matthews, got into the SUV, and drove away.

**Defense Case**

Appellant testified on his own behalf. He stated that he was at his girlfriend's house on the day he was arrested and his mother-in-law allowed the police to enter the house. He denied he was hiding underneath the bed and claimed he was searching for a

9

pacifier. He admitted he was a gang member but denied he had any status within the gang. He stated that some gang members carry guns but denied that he was one of those that carried guns on a regular basis. He admitted that he had been "busted" for possessing a gun but claimed that he had it for his protection when there was animosity between the Rolling 30's and Rolling 60's gangs. He explained that tagging was something gang members did and admitted he scratched "OHC" on a wall in jail. Appellant sold drugs to support his own habit but denied he did so for the gang's benefit and said he did not give the gang a cut of his proceeds.

Appellant testified that he had been selling and using drugs in 2008, prior to the day of the shooting at the dispensary. His drug habit consisted of using PCP and smoking six to seven grams of marijuana on a daily basis, and consuming cocaine and ecstasy on the weekends. He also drank alcohol on a daily basis. Matthews was appellant's former fiancée's cousin, and appellant referred to him as his "drug partner." Appellant claimed he became addicted to PCP because of the pain he experienced after being shot in the arm at Matthews's house in 2003.

When appellant awoke on the morning of October 1, 2008, he drank two 24-ounce cans of malt liquor. He had smoked three blunts the night before and woke up high.[5] He smoked one more blunt that morning and then went to Matthews's house, where he met Banks. He only knew Banks because Banks was Matthews's friend, and he denied telling Detective Shafia that he knew Banks was a Rolling 60's gang member. There was no discussion of a robbery and appellant did not see any guns or zip ties at Matthews's home. Appellant testified that he had $30 or $40 to "get some" marijuana and he mentioned the "pot shop" and told them where they could get some weed. He had heard that some places, including the La Brea Collective, would sell the marijuana without having a card but he denied that he intended to rob the dispensary.

---

[5]    Appellant described a blunt as "a cigar sliced open or busted open, you empty out the tobacco, you fill it up with weed and roll it up and you smoke it."

Appellant, Matthews, and Banks got into the SUV and picked up Gardiner. Matthews drove and dropped off the others in front of the dispensary. Banks showed Gonzalez the medical authorization and all three of them were allowed to enter the dispensary.**6** Appellant testified that he and Gardiner remained in the front of the dispensary with Gonzalez while Banks was allowed to go to the back. Appellant went to the back and upstairs of the dispensary when Banks did not return after a few minutes. Appellant denied seeing Gardiner holding a gun to Gonzalez's head or seeing anyone tied up. When appellant was upstairs, he heard a gunshot and saw two people who had been playing chess duck down. Appellant was "shellshocked" and went back downstairs. Appellant asked Banks if he heard the gunshot and said, "Man, let's go." Appellant walked to the lobby and saw that Gonzalez was blocking the way out. Together with Banks and Gardiner, he pushed on the door. Gonzalez reached in and started shooting. Appellant testified that Gonzalez "almost shot me in my foot." Appellant denied he was armed and said he did not see Banks shoot Gonzalez in the head. Appellant expected Matthews to be waiting outside or around the corner but ran away when he did not see him. He admitted that he spoke with Agbabiaka and met up with Matthews after what "seemed like 10 minutes."

Appellant denied he intended to commit a robbery and stated he did not have any money or marijuana that was stolen from the dispensary. Appellant testified that he did not speak to Banks, Gardiner, or Matthews about the incident and denied bragging to others about the crimes. When he saw a report on television that he was wanted by the police in connection with the crimes, he left the neighborhood. He was not upset that Gardiner had spoken to the police but would have been "heartbroken" if Gardiner snitched on him because Gardiner was his "little bro."

---

**6**     Appellant initially testified that he had not seen the medical authorization prior to that moment, but later testified that he had suggested going to the dispensary because Banks had shown it to him.

Angelique Cantrell knew appellant for over 10 years and was in a relationship with him in 2003. She testified that their relationship broke up because of his marijuana use.

Perry Zimmerman was a certified addiction specialist. After appellant's arrest, Zimmerman conducted testing of appellant and also evaluated him during an in-person interview. Zimmerman opined that appellant had a substance dependence or addiction problem. He stated that people develop a tolerance to drugs over time. Based on appellant's representations to Zimmerman regarding his drug and alcohol use, Zimmerman opined that such a person would not necessarily be impaired and "might still be relatively functional."

## DISCUSSION

### I. *Miranda* **Admonition**

Appellant contends the trial court erred in admitting his interrogation because the *Miranda* admonition was invalid. Specifically, appellant contends the admonition did not specify that appellant's right to counsel "applied before questioning began and during questioning."

### A. *Background*

Following his arrest, appellant was interviewed by Detective Shafia at the LAPD West Bureau Homicide Division.[7] At the beginning of appellant's interview by Detective Shafia, the following colloquy occurred:

"[APPELLANT]: All right. Let's get this shit on the road.

"DETECTIVE SHAFIA: All right.

"[APPELLANT]: I want to ask you some questions, too. How long did it take you to get that fucking warrant to come get me?

---

[7] During discussions related to appellant's motion to exclude his statement based on involuntariness due to coercion and threats, the trial court indicated it had read a transcript of appellant's recorded interview. We granted appellant's motion to augment the record with the transcript.

12

"DETECTIVE SHAFIA: Well, I'll answer that.

"[APPELLANT]: How quick (Inaudible)—

"DETECTIVE SHAFIA: Okay. Here we go. You have the right to remain silent.

"[APPELLANT]: Yeah.

"DETECTIVE SHAFIA: You understand that?

"[APPELLANT]: Yeah.

"DETECTIVE SHAFIA: Yeah. If you give up that right to remain silent, anything you say to me can and used—and will be used against you in court. Do you understand that?

"[APPELLANT]: Yeah.

"DETECTIVE SHAFIA: Yeah?

"[APPELLANT]: I also have the right to say I plead the Fifth.

"DETECTIVE SHAFIA: Yeah. Yeah. Well, that's pretty much what it says, right? You have the right to the an attorney. Do you understand that?

"[APPELLANT]: Yeah.

"DETECTIVE SHAFIA: Okay. And if you can't afford an attorney, one will be appointed to you without charge. Do you understand that?

"[APPELLANT]: Yeah.

"DETECTIVE SHAFIA: Okay. And somebody's read you your rights before, right?

"[APPELLANT]: This was years—couple years ago.

"DETECTIVE SHAFIA: Right. So it's pretty much the same thing.

"[APPELLANT]: I haven't been in trouble.

"DETECTIVE SHAFIA: And it sounds to me like you're smart enough to know that you have those rights and you can express them any time you want.

"[APPELLANT]: Yeah. So go on."

Detective Shafia answered the question posed by appellant prior to the warnings regarding when the warrant for his arrest was obtained, and then began the substantive questioning.

13

### B.  Analysis

The California Supreme Court addressed the issue raised by appellant in *People v. Wash* (1993) 6 Cal.4th 215.  In *Wash*, the interrogating officer advised the accused of "'the right to have an attorney present before any questioning if you wish one, [and] if . . . you cannot afford . . . an attorney one will be provided to you at no cost before any questioning begins. . . .'" (*Id.* at p. 236.)  *Wash* held:  "Although the warning given to defendant here deviated from the standard form in failing to expressly state that defendant had the right to counsel both before and *during* questioning, we are not persuaded—as defendant's argument implies—that the language was so ambiguous or confusing as to lead defendant to believe that counsel would be provided before questioning, and then summarily removed once questioning began.  [Citation.]  As the [United States Supreme Court] has observed, the *Miranda* warnings are 'prophylactic' [citation] and need not be presented in any particular formulation or 'talismanic incantation.'  [Citation.]  The essential inquiry is simply whether the warnings reasonably "'[c]onvey to [a suspect] his rights as required by *Miranda.*'"  [Citation.]  We are satisfied that the warnings given defendant here 'reasonably conveyed' his right to have an attorney present during questioning."  (*Id.* at pp. 236-237; see also *People v. Valdivia* (1986) 180 Cal.App.3d 657, 663-664.)

As in *Wash*, the warning given to appellant deviated from the standard form in failing to expressly state that appellant had the right to counsel both before and during questioning.  Given the detective's warning that appellant could "express" his right at "any time" and appellant's responses as set forth in the colloquy above, we are satisfied appellant was aware of his right to counsel before and during questioning.

In any event, any error in admitting appellant's statements from the interrogation was harmless beyond a reasonable doubt.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Sims* (1993) 5 Cal.4th 405, 447-448 [admission of statement obtained in violation of *Miranda* subject to harmless error analysis under California Constitution].)  Appellant and fellow gang members Banks, Gardiner, and Matthews, participated in an attempted robbery of a marijuana dispensary in which a security guard was killed during

14

its commission. Appellant left his palm print on the inside of the door of the dispensary, he was identified by Agbabiaka, who saw and spoke with appellant in the vicinity of the dispensary, appellant fled the area with Matthews and Gardiner in Banks's SUV, and he hid from the police following the shooting at the dispensary, showing his consciousness of guilt. Thus, even had appellant's statement to Detective Shafia been excluded, appellant would have been convicted of first degree murder, attempted second degree robbery, and second degree commercial burglary.

In sum, appellant's claim of error in the admission of his statement to Detective Shafia fails. We therefore need not address whether appellant forfeited the point by failing to raise it in the trial court or the further assertion defense counsel rendered ineffective assistance in failing to raise the issue below.

## II. Appellant's Statements Were Not the Product of Coercion and Were Voluntarily Given

Appellant contends the trial court erred in admitting his statements to Detective Shafia because they were the product of coercion and promises. Specifically, appellant contends he was promised leniency if he cooperated.

### A. Background

During the hearing on the motion to exclude appellant's statements as the product of coercion and promises, defense counsel cited specific excerpts from the interrogation as examples of Detective Shafia's "continual use of pressure and duress and promises." The prosecutor argued that Detective Shafia "simply informed [appellant] that he was facing special circumstance charges, informed [appellant] of the accurate penalty that is associated with that [and] gave [appellant] the option of speaking." The court did not agree with defense counsel's characterization of Detective Shafia's comments as implied threats. The court stated that defense counsel was "taking leaps" that had no basis in the transcript of appellant's interview. The court found that Detective Shafia informed appellant that he had a choice to either cooperate with the district attorney's office or deny, that appellant's participation in the incident was different from the individual who killed Gonzalez, and that only the district attorney had the authority to determine what

15

punishment appellant would face. The court stated that appellant appeared to be intelligent, "somewhat sophisticated, somewhat cagey" and not the type to be easily manipulated. The court found that appellant's claim of coercion was unfounded and denied appellant's motion.

### B.      *Standard of Review and Applicable Legal Principles*

When a defendant challenges the voluntariness of a confession on appeal, we review independently the trial court's legal determination of voluntariness. (*People v. Williams* (1997) 16 Cal.4th 635, 659.) We review for substantial evidence any factual findings regarding the surrounding circumstances of the confession. (*Id.* at p. 660.)

Basic law limits the prosecution's use of a defendant's involuntary confession. The burden rests with the prosecution to establish, by a preponderance of the evidence, that the confession was voluntary. (*People v. Williams* (2010) 49 Cal.4th 405, 436.) The "question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" (*People v. Hogan* (1982) 31 Cal.3d. 815, 841, disapproved on other grounds by *People v. Cooper* (1991) 53 Cal.3d 771, 836.) No single criterion is dispositive to prove voluntariness. (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.) Rather, a court must closely examine the facts of the case and assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"—to determine if a suspect's will was overborne. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)

In considering the characteristics of the accused, the court may weigh his or her education, maturity, sophistication, prior experience with the criminal justice system, and emotional state. (*People v. Williams*, *supra*, 16 Cal.4th at p. 660.) Our Supreme Court has disapproved of police tactics specifically "calculated to exploit a particular psychological vulnerability of defendant" (*People v. Kelly* (1990) 51 Cal.3d 931, 953) or his emotional state (*People v. Hogan*, *supra*, 31 Cal.3d at pp. 841-843).

16

The police may not elicit a confession by an express or implied promise of leniency to the accused, if the promise is a motivating cause of the accused's decision to confess. (*People v. Williams*, *supra*, 16 Cal.4th at pp. 660-661.) While "[t]he line between a threat (or a promise) and a statement of fact or intention can be a fine one" (*People v. Thompson* (1990) 50 Cal.3d 134, 169), mere advice or exhortation by the police that the accused would be better served to tell the truth is not alone a promise of leniency. (*People v. Tully* (2012) 54 Cal.4th 952, 993.)

### C.    Appellant's Interview

Detective Shafia began by summarizing the evidence the police had regarding the "botched robbery" and shooting at the dispensary. He stated that it was gang related, he believed Banks was the shooter, appellant's fingerprints were found on the metal door of the dispensary, and appellant's DNA was found inside Banks's vehicle. Initially, appellant denied knowing who Banks was but almost immediately said he saw him at Matthews's house and had in the past ridden in Banks's vehicle which explained the presence of his DNA. Detective Shafia reminded appellant of his family, including his newborn child, and told him "It's about self-preservation." Detective Shafia told appellant that Matthews had not "copped out" as was rumored, that Gardiner had not implicated anyone, and Banks insisted he was not at the dispensary and did not do anything. Detective Shafia said a lot of mistakes were made at the dispensary and Banks "just got incredibly stupid" but Banks's mistakes affected everyone including appellant. Detective Shafia told appellant that he had evidence that placed appellant at the scene but not that he was the shooter and that appellant should "think about [his] kids" and think about who he is and "where [he is] at."

Detective Shafia had recordings of jail telephone calls from Gardiner, interviews of Banks and Matthews, Banks's mother's telephone calls, and an interview with a gang member named Justin Wilson, with whom Detective Shafia had spoken when looking for appellant. Appellant was concerned if Gardiner had said "some shit about [the] case" and if anyone had said anything "bad" about him, or "told" on him. Detective Shafia said he told the mother of appellant's child that appellant had to choose between "his family, his

17

kids, his well-being" or being "down for the 'hood.'" Appellant asked Detective Shafia to explain the choices available to him. Detective Shafia responded that one path was "complete denial," which could lead to a jury that would take away appellant's freedom. If appellant took the other path and concentrated on his family and what he wanted as far as his life was concerned and where he was going to go with it, then he needed to look at how he could mitigate matters. Detective Shafia explained that "mitigate" meant how appellant could "lessen or soften or control the outcome."

Detective Shafia told appellant there was no doubt that the evidence showed that the "bullet in the kid's head" was fired by the gun used by Banks. He said Banks would probably be on death row and had dragged appellant, Gardiner, and Matthews down with him. At appellant's request, Detective Shafia explained how the killing of the security guard made the case eligible for the death penalty. Appellant asked if he was the "missing link," and Detective Shafia told him he was not and that Matthews and Banks already had their preliminary hearing. Appellant identified Gardiner from a photo and was surprised when Detective Shafia referred to Gardiner by his gang moniker.

Detective Shafia continued to tell appellant that he knew Banks was the one with the gun and that appellant was at the scene. Detective Shafia told appellant that if Gardiner had not lost control of the security guard "it probably wouldn't have come to any of this." He told appellant, "[Y]ou got to kind of look at it yourself and go, 'What the fuck am I going to do?'" Detective Shafia said he had spoken to the other three participants and had given Gardiner and Matthews the same options as appellant, but could not do that for Banks because Banks was going to death row. Detective Shafia told appellant that he, Gardiner, and Matthews did not have to spend the rest of their lives in prison, but given what the police knew, appellant could not maintain that he was not there and did not do anything.

Appellant asked if his "girl" was alright and Detective Shafia assured him that she would be fine and that she lived with her mother. Appellant asked Detective Shafia to give him his word that nothing would happen to her, and Detective Shafia did so. Appellant asked if the anonymous caller that gave the tip that led to his arrest was male

18

or female. Detective Shafia would not answer but told him it was more than one person and he had had surveillance in place for a long time. Detective Shafia and appellant discussed appellant's father, who was in prison for domestic violence, and appellant's sister, who was in prison for robbery. Appellant asked if he was the only one in trouble, and Detective Shafia responded, "Yeah. Well you and these guys."

Appellant asked about court dates and Detective Shafia stated that Matthews might have a separate trial because he was the driver, but then clarified that it would be up to the district attorney to decide if there were individual trials for the participants. Detective Shafia told appellant that Matthews claimed that he thought they were going to "score some weed" and did not know that "this shit was going to happen." Detective Shafia told appellant that he presented forensic evidence at the preliminary hearing for Banks and Matthews, and both of them were identified by witnesses. Detective Shafia told appellant, "[N]ow you have come to that cross road. Now you have to pick. What was the plan before you got there? Any idea? Appellant asked if he could "plead the Fifth," and Detective Shafia told him he could. Appellant said he could let his public defender "say whatever" but was concerned that the public defender would not care how much time appellant got. Appellant said if he sat back and did that he was going to get "fucked." Appellant stated he "got to say something." Detective Shafia told appellant to offer an explanation for what happened and said, "I'm not saying to you that you're not going to have to face a judge, and you're not going to get in trouble. But Goddamn, do you really need to go to jail for the rest of your life? Appellant said he did not want to go in front of a jury. Appellant asked, "So if I take a deal, right, without seeing a jury, what does that mean? What am I—what—what—how does that—how does that go? Detective Shafia told appellant, "You'd have to tell your public defender you want a meeting with the district attorney and you would have to tell the district attorney everything you know about what happened and try to make a deal with him. That's how it would work. You wouldn't be able to make any kind of big deals with me to avoid a jury. But if you told me some of the things that happened and the D.A. knew, yeah, [appellant's] not wanting to go to jail forever. And the D.A. knew that you were

19

basically cooperating with the whole investigation, he—and I say to him, 'Hey, look, this is what he did. This is what he told me he did, and he would like to work with the D.A.'s office so that he doesn't go to jail the rest of his life. Because he's not the one that shot the guy." Detective Shafia reiterated that he had no proof that appellant had shot anyone but appellant was stuck with the way it went down and needed to "go over a couple of details, and then we'll tell the D.A." Appellant stated, "I don't want to be gone for seven years." Appellant asked if there was "proof" he was there, and Detective Shafia told him that he had appellant's fingerprints inside the door, and the testimony of the witness appellant approached after the shooting. Detective Shafia told appellant that his denials would be unbelievable to a jury, and that a "botched robbery with a murder is life." Appellant asked if he was "looking at life" and Detective Shafia said that it was possible. Appellant asked what he would face if he did not go to trial and took a deal. Detective Shafia told him he did not know because "that's a deal you have to make with the D.A." Appellant asked if it would be "under 10?" and Detective Shafia responded, "No." Appellant then asked, "17?" Detective Shafia said he hated to say yes or no but "[w]ithout a gun, maybe." Appellant continued to press claiming he was clean, not on parole, and had not been in any trouble. Detective Shafia responded, "I know. But the D.A.'s the one that makes that decision. I'm telling you. It's not me."

Detective Shafia asked appellant to describe what happened and how his prints were on the inside of the door of the dispensary. Appellant asked if he would be allowed to leave if he said he was innocent. Detective Shafia told him there was "no way." He reminded appellant that he could talk to the district attorney at anytime but appellant needed to tell his public defender to do so. Appellant said, "Make it happen right now." Detective Shafia told appellant that he could not get a district attorney in the middle of the night but he could write some positive things down about appellant and what he said. If appellant's public defender asked to set up a meeting, the district attorney would listen to appellant and make a decision. Appellant asked what the district attorney wanted to hear and Detective Shafia told him to start from the beginning where he was picked up and go all the way to the end. Appellant would be required to explain to the district

attorney how he got involved, how they entered the dispensary, and how his print got on the door. Detective Shafia suggested that appellant could talk to him about the print and then Detective Shafia could tell the district attorney, "Look, I sat down with him. He felt Leon was the one that was responsible. And he did not want to go to jail for the rest of his life so this is what he told me. He talked about the reason his print was on the back of the door. He talked about why the DNA was in—" Appellant interrupted to ask if his was the only print found, and Detective Shafia told him there was also a print found on the physician's statement.

Detective Shafia detailed all the evidence against appellant and asked him again to explain what happened. Detective Shafia told appellant that if he could give the district attorney a little bit, then appellant could go to his defense attorney and say, "Listen, I want a meeting with the D.A. I already told them a little bit. I'll tell them the whole story. I don't want to go to prison the rest of my life." Detective Shafia again talked about the two paths appellant faced and told him if he chose to "dummy up and you go that path, the D.A.'s not going to trust. Nobody's going to trust you. And they're going to put you in front of a jury. And you know you don't want that."

Appellant asked, "[W]hat you want me to do?" and asked what the others had said. Detective Shafia told him that Matthews had said he went in to "score some weed," that Gardiner had said the same thing, and that Banks refused to talk. Appellant said he had been "chilling and smoking" with Matthews the day before the dispensary robbery because Matthews "had just got out the pen." Appellant asked Detective Shafia to show him the "print of [his] finger." Detective Shafia told appellant he had the print in his book and he was not lying or trying to trick appellant. He told appellant it was a "great case" because "a lot of mistakes were made" and Banks "did some stupid shit." Detective Shafia said, "So my position to you is make a choice, dude. Make a choice. Do you want to go this path and join him—not him, because I don't think they can ever put you on death row. But do you want to try and fight something that you're going to be in prison the rest of your life. Or would you rather say, you know what, fuck this, man? I got some kids. I got some family. I got some people that I need to take care of. And,

21

ultimately, even though I'm kind of in a world of shit right now, I might be able to find my way out. At least some sort of light at the end of the tunnel. Appellant said the police had made him look "like a bad guy on TV." Detective Shafia said he didn't have to do a lot of work on the case because a lot of mistakes were made. He knew appellant had not gone to the dispensary to kill anyone and asked appellant, "[W]hen you and [Matthews] were in the car and [Banks] got in and [Gardiner] got in, what was the plan? And was it a simple plan?" Appellant responded, "Get high." He said "that marijuana shit, that legal shit" was "way better" than the marijuana available on the street. Appellant then proceeded to tell Detective Shafia about the plan and everything that happened that day including the shooting and their escape.

### D.    *Substantial Evidence Supports the Trial Court's Ruling*

Appellant provides excerpts from the 81-page interview and argues they show that Detective Shafia threatened appellant with life in prison if he did not cooperate and made improper promises to him for his cooperation. Appellant bases his involuntariness claim on interpretations of the evidence that the trial court unequivocally rejected.[8] Following our review of the entire interview to determine "whether coercive police activity was present, whether certain conduct constituted a promise and if so, whether it operated as an inducement" we independently reject appellant's claim that his statements were the result of either threats or promises. (*People v. Benson* (1990) 52 Cal.3d 754, 779.)

Appellant claims that Detective Shafia's "promise to put in a good word with the prosecutor, with its manifest insinuation of a chance at a lesser sentence" was coercive. The record dispels the assertion. Detective Shafia told appellant he would pass along any information appellant gave him to the district attorney but he never stated that appellant would get anything in return. He repeatedly told appellant that he had no control over making deals, and any deal would have to be made with the district attorney's office.

---

[8]    The trial court stated, "I think you are taking leaps that have no basis in the words that I am looking [at]," and "I really didn't see any language that I interpreted as threatening."

22

(See *People v. Boyde* (1988) 46 Cal.3d 212, 238 [no promise of leniency where detective told defendant he could only pass along information to the district attorney]; *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409 [confession not coerced by promise of leniency where officer told defendant he would speak with the district attorney if defendant was honest, but that it was up to the district attorney to take further action].)

Appellant also asserts that Detective Shafia "hinted at what [appellant's] sentence would be if he cooperated" and repeatedly coerced appellant with the "stark choice of talking now or facing life in prison." The record shows that at appellant's request Detective Shafia explained that a killing during the commission of a robbery made it a case eligible for the death penalty. Detective Shafia told appellant that he knew Banks was the shooter and that appellant, Gardiner, and Matthews did not have to spend the rest of their lives in prison. The detective's statements are factual statements about the consequences of a murder conviction. Appellant has not cited, and we are not aware of, any cases finding the recitation of the punishment for a crime to be a threat. Appellant was aware that he was facing some form of punishment and the record shows that it was he who first mentioned the length of a potential sentence when he said, "I don't want to be gone for seven years." Over the next couple of minutes Detective Shafia summarized the evidence against appellant. Appellant then began asking about a deal with the district attorney and potential sentences. It was appellant who asked if sentences of "under 10" and "17" were likely as a result of a deal. Detective Shafia repeatedly told appellant that he had no control over making deals and appellant and his defense counsel would have to speak with the district attorney. Detective Shafia impressed upon appellant the overwhelming evidence against him and urged him to tell the truth. "[W]hen law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises." (*People v. Carrington* (2009) 47 Cal.4th 145, 172.)

We find no support in the record for appellant's assertion that Detective Shafia's references to appellant's children was "a particularly pernicious element of the totality of the coercive conduct." Detective Shafia told appellant he should consider his children in

23

deciding which path he wanted to take, i.e., either cooperate with the investigation or deny all involvement in the crimes. The references to appellant's children were generic and appellant was never told he would not be able to see his children or that anything would happen to them if he did not cooperate. This case is in no way similar to *United States v. Tingle* (9th Cir. 1981) 658 F.2d 1332, where FBI agents questioned Tingle in the backseat of a squad car. Tingle was sobbing and noticeably shaking and the agents told her she would not see her two-year-old child for a long time while in prison. The agents promised to inform the prosecutor if Tingle was cooperative but if she was not the prosecutors would be told she was "'stubborn or hard-headed.'" (*United States v. Tingle, supra*, 658 F.2d at pp. 1333-1336.)

As the People point out, the police tactics used in appellant's case cannot be meaningfully distinguished from those found noncoercive in *People v. Holloway* (2004) 33 Cal.4th 96, 113-116. "[T]he detectives in this case did not cross the line from proper exhortations to tell the truth into impermissible threats of punishment or promises of leniency." (*Id.* at p. 115.) Detective Shafia's "remarks did not constitute a promise of leniency," but "only pointed out the benefit that might naturally flow from a truthful and honest course of conduct." (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1204.) "Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not, however, make a subsequent confession involuntary." (*People v. Boyde, supra*, 46 Cal.3d at p. 238.)

Furthermore, as our Supreme Court stated in *People v. Jones* (1998) 17 Cal.4th 279, 297-298, "[t]he business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof.' [Citation.] 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]"

24

The circumstances in this case do not suggest a coercive atmosphere likely to produce an involuntary and unreliable statement. (*People v. Jones*, *supra*, 17 Cal.4th at p. 298.) We find no error.

## III. Redaction of Appellant's Statement

Appellant contends the trial court erred by redacting portions of his statement which tended to show that his statements were involuntary and consequently not reliable or credible.

When the trial court denied appellant's motion to exclude his statement to Detective Shafia as involuntary (see part II, *ante*), appellant moved to have the jury hear the entire statement. Appellant wanted the jury to hear Detective Shafia's references to "life in prison" and other references to punishment to show appellant's statements were coerced. The trial court ruled that references to punishment should be redacted so the jury would not be influenced. Appellant elected not to play the redacted version of the interview for the jury and, as the prosecution had done, elicited information regarding appellant's statements through Detective Shafia. At the close of evidence, defense counsel argued that the court's ruling prevented him from exploring the issue of coercion, but the trial court said he was not precluded from asking appellant "questions exploring whether the police exercised any coercion or undue pressure during the course of the interview." Defense counsel asked to recall appellant and the court agreed. However, when court resumed the following day, appellant was not recalled and the jury was instructed.

Appellant argues the trial court's redactions violated Evidence Code section 356, referred to as the "rule of completeness." (See *People v. Ervine* (2009) 47 Cal.4th 745, 783.) That section provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

"The purpose of Evidence Code section 356 is to avoid creating a misleading impression. [Citation.] It applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130.) "Section 356 is indisputably "'subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced.'" [Citations.] 'The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy . . . .'" (*People v. Williams* (1975) 13 Cal.3d 559, 565.) An additional portion of a conversation "may be excluded at the court's discretion if it does not serve to clarify or explain" the portion introduced by the adverse party. (*People v. Von Villas* (1992) 10 Cal.App.4th 201, 272.) Limits on the scope of evidence admissible under Evidence Code section 356 may be proper. (See *People v. Lewis* (2008) 43 Cal.4th 415, 458, overruled on another point in *People v. Black* (2014) 58 Cal.4th 912 [limits proper when a codefendant's rights under *People v. Aranda* (1965) 63 Cal.2d 518 or *Bruton v. United States* (1968) 391 U.S. 123 would be violated].) We review the trial court's ruling on the admissibility of additional portions of appellant's interview under Evidence Code section 356 for abuse of discretion. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

We have reviewed the redactions of which appellant complains and the discussion between the court and parties as reflected in the reporter's transcript. The redactions challenged on appeal all relate to discussions of punishment. The trial court did not abuse its discretion under Evidence Code 356 by excluding the portions of appellant's statement that referred to the potential punishment he faced if convicted. (See *People v. Alvarez* (1996) 49 Cal.App.4th 679, 687 ["'It is settled that in the trial of a criminal case the trier of fact is not to be concerned with the question of penalty, punishment or disposition in arriving at a verdict as to guilt or innocence.'"].)

## IV. Detective Shafia's Opinion Testimony Was Admissible

Appellant contends the trial court erred by allowing Detective Shafia to testify that the word "score" was slang for "steal." Appellant contends the testimony was

26

speculative as there was "no showing that the detective was an expert in drug dealing or commercial burglaries or the jargon of local street gangs or of youths in general." We find no merit to this contention.

Detective Shafia had been a police officer for over 31 years and a detective for 21 years and had vast experience investigating crimes and interviewing suspects for all types of crimes such that his expertise extended to numerous slang terms used by criminals. Detective Shafia testified that appellant stated during his interview that the plan was to "score some weed." Detective Shafia testified that the term "score" could mean a number of things including "to get drugs" but in the context appellant used it, it meant to "steal it from the marijuana clinic."

"'The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. [Citation.] This court may find error only if the witness "'*clearly lacks* qualification as an expert.'" [Citation.]'" (*People v. Singleton* (2010) 182 Cal.App.4th 1, 21.) "Courts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." (*United States v. Thomas* (6th Cir. 1996) 74 F.3d 676, 682, disapproved on another ground in *Morales v. American Honda Motor Co., Inc.* (6th Cir. 1998) 151 F.3d 500, 515.)

The trial court did not abuse its discretion in permitting Detective Shafia to testify regarding the meaning of the term "to score." Prior to the interview, Detective Shafia was aware of evidence that appellant and his companions were armed with at least two guns, and had brought zip ties with them to bind their victims. During the interview, appellant told Detective Shafia that he had no money but his plan was to get marijuana from the clinic and "get high." Detective Shafia's 31 years' experience as a police officer clearly qualified him to opine that under those circumstances appellant intended to steal the marijuana. (*People v. Singleton*, *supra*, 182 Cal.App.4th at p. 21.)

In any event, it is not reasonably probable that appellant would have obtained a better result had the court excluded Detective Shafia's opinion. (*People v. Watson* (1956)

27

46 Cal.2d 818, 836.)  Contrary to appellant's argument that this was "a reasonably close case" the probative value of the comment was minimal at best and the evidence against appellant was overwhelming.  The jury heard evidence that appellant demanded to know where "the shit" was when inside the dispensary, had left his palm print on the inside of the door leading out of the marijuana dispensary, had fled from the scene of the shooting with Banks and Gardiner and, along with Gardiner, had been picked up by Matthews, the getaway driver.  In addition, there was an eyewitness identification by Agbabiaka, who saw appellant a few blocks from the dispensary and appellant's attempted flight just before his arrest.   In the exercise of common sense, the jury would have arrived at the same opinion as Detective Shafia that the context suggested that the term "score," as used by appellant, was slang for steal.

## V.       Alleged Prosecutorial Misconduct

### A.       Appellant's Arguments

Appellant contends the prosecutor committed prejudicial misconduct.  Specifically, appellant contends that the prosecutor (1) implied during her cross-examination of appellant that she had evidence that appellant bragged about the incident to Althea Doss; (2) implied that a participant in the robbery, Gardiner, had inculpated him; and (3) misstated the law as to an element of the gang enhancement.

### B.       Relevant Authority

"The applicable federal and state standards regarding prosecutorial misconduct are well established.  '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"'  [Citations.]  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""  [Citation.]  As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.

[Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

A defendant's conviction will not be reversed for prosecutorial misconduct that violates state law unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071.)

### C.     *Prosecutor's Reference to Althea Doss*

On cross-examination, appellant testified that he did not speak to Banks, Gardiner, or Matthews about the incident at the dispensary and denied bragging about the crimes to others. The prosecutor asked him if he had gone back to the neighborhood and spoken with Gardiner's girlfriend, Althea Doss. Appellant said he knew who she was but he did not talk to her or socialize with her. The prosecutor then asked, "And you saw her statement that you came back and bragged about–" The trial court sustained defense counsel's hearsay objection and the prosecutor then asked appellant, "Did you brag to Miss Doss about what you had done with David on October 1st of 2008, including killing the security guard?" Appellant responded, "No, I didn't."

Appellant objected only to the prosecutor's first question and neither objected nor asked to approach when the prosecutor rephrased the question. Appellant forfeited this particular claim of prosecutorial misconduct because he did not timely object on this ground in the trial court, which is a prerequisite to preserving such a claim for appellate review. (See *People v. Dykes* (2009) 46 Cal.4th 731, 766 [defendant's relevance objection was insufficient to preserve a claim of prosecutorial misconduct; no request for admonition].)

Even if appellant had not forfeited this claim, we would reject it on the merits. A prosecutor engages in misconduct by intentionally eliciting inadmissible testimony. (*People v. Valdez* (2004) 32 Cal.4th 73, 125.) The record affords no basis for concluding that the prosecutor did so in this case. The prosecutor had a statement from Doss that

29

appellant and Gardiner had discussed the crimes in her presence and the trial court had ruled that her testimony was admissible. The prosecutor asked no further questions on that specific issue after appellant denied bragging about the crimes to Doss. The prosecutor had stated her intent to have Doss testify at trial. Doss's testimony would have been admissible to impeach appellant on rebuttal. That the prosecutor ultimately chose not to call Doss as a witness does not mean that she did not have a good faith basis to believe that she could establish the facts about which she had asked appellant. On this record, therefore, we cannot find prosecutorial misconduct.

### D. Prosecutor's Reference to David Gardiner

During appellant's cross-examination, appellant admitted that he and Gardiner were friends but denied committing any crimes with him. The prosecutor then asked if appellant was upset because of what Gardiner said to the police regarding the crimes. The trial court denied defense counsel's request to approach but told the prosecutor to "be mindful." The following colloquy then took place:

"[PROSECUTOR]: I can't testify as to what he said, but isn't it true that you were upset with him that he spoke with the police?

"[APPELLANT]: Not actually upset, but—I can't really say, you know.

"[PROSECUTOR]: Did you feel that he was snitching on you?

"[APPELLANT]: If I thought he was snitching, how should I answer this? I would be heartbroken, sad. I'd probably be up here crying. I mean, that's my little bro, I give him a hug every time I see him.

"[THE COURT]: There was a relevance objection. I would ask counsel to move into a different area."

The prosecution's gang expert, Officer Marshall, had earlier testified that gang members prefer to commit crimes with other gang members because they trust each other. He also testified on the concept of snitching and stated that some gangs not only "frown" upon it but actually kill any gang members that engage in snitching. Appellant maintained he knew nothing about the robbery even though it was his idea to go to the clinic. He also denied committing any crimes on behalf of the gang. He testified that he

30

would expect retaliation if he revealed the role of other gang members in these crimes, and he denied that he and Gardiner had a special gang relationship. Part of the prosecution's theory was that appellant and Gardiner were in a "big homie, little homie relationship" and that Gardiner would not have intended to commit the crime without appellant's knowledge.[9] Thus the prosecutor's questions were relevant to appellant's credibility.

Even if we assume error, appellant fails to demonstrate that he was prejudiced by the prosecutor's conduct. The test for prejudice is the *Watson* question whether there is a reasonable probability of a different result absent the error. (*People v. Adan* (2000) 77 Cal.App.4th 390, 393.) There was no prejudice to appellant. The trial court sustained its own relevance objection to the questioning about Gardiner's statement to the police. The prosecutor did not refer to this line of questioning during her closing argument. Furthermore, the jury was instructed that statements of counsel were not evidence and juries are presumed to follow the court's instructions. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Based on the jury instructions and the overwhelming evidence supporting appellant's conviction, it is not reasonably probable that appellant would have obtained a result more favorable in the absence of the prosecutor's references to Gardiner's alleged comments to police. (*People v. Hines* (1997) 15 Cal.4th 997, 1036-1038 [possible erroneous implication from prosecutor's questions harmless under state law standard of review given overwhelming evidence of guilt].)

### E. Gang Enhancement

Appellant argues the prosecutor misstated the law in declaring that the element of gang association is established when "two gang members get together and commit a crime."

The prosecutor argued that the jury had to consider whether the gang allegations had been proved. Appellant questions the following italicized portion of the argument:

---

[9]     Appellant's gang moniker was "Bronx" and Gardiner's was "Little Bronx."

31

"In this case we'll talk about we have association, which satisfies the gang allegation. So the elements of the gang allegation are the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang. Again, that's important word in the law, 'or.' So, even if you found for some reason that this particular crime had no benefit to the Rolling 30's, you have association. *The law says anytime two gang members get together and commit a crime, that this element is satisfied.* Because the law doesn't criminalize you associating with gang members. But once you get together and commit crimes together, the law has an additional allegation that that applies."

Appellant's claim of prosecutorial misconduct is waived because it was not raised below. "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury," or forfeit the claim on appeal. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) Here, because appellant did not timely object and request a curative admonition, and has not shown either of those actions would have been futile, he has forfeited his claim.

Because appellant asserts his counsel was ineffective for failing to object, we address the merits of his claim. Appellant contends the jury could only interpret the prosecutor's statement as telling them that "as a matter of law" the element had been proven. Appellant is of course correct that a prosecutor commits misconduct by misstating the law. (*People v. Gray* (2005) 37 Cal.4th 168, 217.) However, our review of the prosecutor's argument in its entirety convinces us that the prosecutor did not engage in ""deceptive or reprehensible methods to attempt to persuade either the court or the jury."" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.) The prosecutor began her argument by discussing the evidence supporting the substantive counts. She then summarized Officer Marshall's gang expert testimony and argued that it established the elements of the gang allegation, at which point she made the challenged statement. The prosecutor referred to the evidence that would show that appellant had committed the crimes for the benefit of the gang and to the evidence that would show that he had done so in association with a criminal street gang. Whether the prosecutor was attempting to

differentiate the elements of benefit and direction *from* association, or suffered a brief moment of disorganization, her comment was not intended to mislead the jury as appellant suggests.

Moreover, the trial court's instructions dispelled any possible harm. The court instructed the jury with CALCRIM No. 200: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." "In the absence of evidence to the contrary, we presume the jury understood and followed the court's instructions." (*People v. Williams* (2009) 170 Cal.App.4th 587, 635.)

The record failed to show there was no plausible tactical reason for defense counsel's failure to object to the challenged statement. Counsel could have decided the alleged misstatement was of little or no consequence to the defense, or that objecting to it would have unnecessarily focused the jury's attention on the comment rather than evidence that could have aided appellant. The other difficulty with appellant's ineffective assistance of counsel claim is the element of prejudice. Given the weight of the evidence to support the gang enhancement, appellant cannot show prejudice. In sum, the record here does not support an ineffective assistance of counsel claim.

## VI. Sufficient Evidence Supports the "Primary Activities" Element of the Gang Enhancement

Appellant argues substantial evidence does not support the gang enhancement because there was insufficient evidence of the Rolling 30's' primary activities.

To establish that a group is a "criminal street gang" within the meaning of the statute, the prosecution must prove, among other elements, that one of the group's primary activities is the commission of one or more offenses listed in section 186.22, subdivision (e), and that the group's members engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)

The term "primary activities" "implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations.

[Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Sufficient proof of these "primary activities" may consist of "evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," or testimony from a police gang expert, who bases his or her opinion on conversations with gang members, personal investigations of crimes committed by gang members, and information from law enforcement colleagues. (*Id.* at p. 324.) We may consider both past and currently charged offenses as part of the gang's "primary activities." (*Id.* at p. 323.)

A gang enhancement true finding must be based on substantial evidence. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1221, 1224.) In determining whether substantial evidence supports a gang enhancement, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements true beyond a reasonable doubt. (*Id.* at p. 1224.)

There was ample evidence to satisfy the "primary activities" element of the gang enhancements. Officer Marshall was a highly trained gang expert who had been assigned to investigate the Rolling 30's gang. He testified the primary activities of the gang were to commit burglary, robbery, narcotics sales, possessions of firearms by a felon, "gang on gang" shootings, murders, attempted murders, and drive-by shootings. Two abstracts of judgment were admitted showing convictions of Rolling 30's gang members Goff for burglary and Phillips for carrying a concealed firearm. Officer Marshall was familiar with both Goff and Phillips. The jury was also permitted to consider appellant's current offenses. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 323.) This evidence was more than sufficient to satisfy the "primary activities" requirement for the gang enhancements.

Appellant relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605, and argues that Officer Marshall's testimony was conclusory and without adequate foundation. Appellant's reliance is misplaced. In *Alexander L.*, when asked about the gang's primary activities, the gang expert testified "he knew" the gang had committed "quite a few"

34

enumerated crimes.  No information establishing the reliability of his opinion was elicited.  On cross-examination, the expert testified that the majority of the cases connected to the gang that he had run across were graffiti related.  The court found there was not an adequate foundation for his opinion because he did not explain the sources of his information.  (*Id.* at pp. 611-612.)  In contrast, Officer Marshall's opinion was based on his several years of experience investigating gang crimes in general, and in particular the Rolling 30's gang to which he was assigned.  The court's analysis in *Alexander L.* is not applicable here.  (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.)

## VII.  No Instructional Error Regarding the Section 186.22 Gang Allegation

Appellant next contends that the trial court failed to properly instruct jurors on the section 186.22 gang allegation and lessened the prosecution's burden of proof, requiring reversal of the gang enhancement findings.  Specifically, appellant claims that three of the criminal acts used to define primary activities, assaults, felony vandalism and felony firearms violations, were not qualifying primary activities and were also overbroad and not defined for the jury.

Pursuant to CALCRIM No. 1401, the trial court instructed the jury as follows:  "A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal:  1.  That has a common name or common identifying sign or symbol; 2.  That has, as one or more of its primary activities, the commission of *assaults, felony vandalism, drug sales, robbery and felony firearm violations*; and 3.  Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.  In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.  A pattern of criminal activity, as used here, means:  1.  The commission of any combination of two or more of the following crimes:  burglary, unlawful possession of a firearm; 2.  At least one of those crimes was committed after September 26th, 1988; 3.  The most recent crime occurred within three years of one of the earlier crimes; and 4.  The crimes

35

were committed on separate occasions or were personally committed by two or more persons." (Italics added.)

Although felony vandalism is a qualifying offense in the gang enhancement statute (§ 186.22, subd. (e)(20)), the offenses of "assaults" and "felony firearms violations" are not. The instruction therefore was erroneous.[10]

We nonetheless find that the error in listing "assault" and "felony firearms violations" as potential primary activities was harmless beyond a reasonable doubt, under the test in *Chapman v. California*, *supra*, 386 U.S. 18. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324 ["What harmless error standard governs a trial court's failure to instruct the jury on the primary activities element of the criminal street gang enhancement provision . . . depends on whether the enhancement provision increases the maximum possible penalty for the underlying crime."].) The trial court's instruction on the primary activities element also included for consideration "drug sales" and "robbery." The evidence showed that members of the Rolling 30's engaged in these activities. Officer Marshall testified that the Rolling 30's primary activities consisted of "459, which is burglary, robbery, narcotics sales, possessions of firearms. Shootings." Officer Marshall clarified that narcotics sales meant "Marijuana and rock, rock cocaine . . . ." Therefore, the trial court correctly listed three qualifying crimes—robbery (§ 186.22, subd. (e)(2)), sale of controlled substances (§ 186.22, subd. (e)(4)), and felony vandalism (§ 186.22, subd. (e)(20)).

Section 186.22, subdivision (f) states the prosecution need only prove one crime as a primary activity. Here, the jury was instructed that it could consider the commission of three qualifying crimes. In light of all of this, we conclude, beyond a reasonable doubt,

---

**10** As an initial matter, appellant neither objected to the instruction nor requested clarifying instructions. Having failed to do so, appellant may have forfeited the claim on appeal. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 ["'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'"].)

that the jury would not have relied solely on evidence of "assault" and "felony firearms violations" to support the gang enhancement, and the trial court's error was harmless beyond a reasonable doubt.

## VIII. Abstract of Judgment[11]

### A. *Custody Credit*

Appellant contends, the People concede, and we agree that the trial court failed to award appellant presentence custody credits. Appellant is entitled to actual custody credit for all days of custody in county jail, including partial days. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48, citing *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) The calculation for actual custody credit includes the day of arrest and the day of sentencing. (*People v. Rajanayagam*, *supra*, at p. 48.)

Appellant was arrested on March 6, 2010, and sentenced on May 24, 2013. Appellant is entitled to 1,176 days of actual presentence custody credit, and the abstract of judgment should be amended to reflect such custody credit.

### B. *Parole Revocation Fine*

The abstract of judgment for the indeterminate sentence on count 1 incorrectly reflects that the trial court imposed a $280 parole revocation fine pursuant to section 1202.45. The trial court correctly did not impose this fine because appellant was sentenced to a life term without the possibility of parole. (*People v. Petznick* (2003) 114 Cal.App.4th 663, 687.) Accordingly, the abstract of judgment should be corrected to strike this fine.

### C. *Victim Restitution Order*

Appellant contends, the People concede, and we agree that the abstract of judgment should be amended to reflect joint and several liability for the $3,595.33 in direct victim restitution to the Victim Compensation and Government Claims Board for burial expenses. The trial court orally pronounced that the payments were to be joint and

---

[11] The trial court prepared two abstracts of judgment, one for the indeterminate sentence on count 1, and one for the determinate sentence on counts 2 and 3.

several.  Accordingly, the abstract of judgment should be amended to reflect the trial court's oral pronouncement.  (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

### D.    *Gang-Related Firearm Enhancement on Count 2*

Appellant contends that the gang-related firearm enhancement on count 2 should be stricken because the prosecutor elected not to charge it on this count.  The People concede, and we agree.

The record reflects that during jury instructions the prosecutor elected to charge appellant with the section 12022.53, subdivisions (d) and (e) enhancement only as to count 1, and the jury was instructed accordingly.  However, the verdict form for count 2 included the allegation, and the jury found it to be true.  At sentencing, the trial court imposed and stayed the term for the enhancement pursuant to section 654.

The judgment shall be modified to strike, rather than stay, the enhancement on count 2.  (*People v. Scott* (1994) 9 Cal.4th 331, 354 [an unauthorized sentence is subject to correction when it comes to the attention of the reviewing court]; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1160 [remand is not necessary where there is no need for the trial court to exercise discretion].)

### E.    *Mandatory Fees*

The People contend the judgment should be modified to reflect the proper mandatory court security fees[12] and criminal conviction assessments[13] because "the trial court did not orally pronounce them."

---

[12]    Under section 1465.8, subdivision (a), a $40 court assessment "shall be imposed" on every felony criminal conviction.  One fee of $40 should be imposed for each conviction.  (*People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.)  Appellant was convicted of three offenses and the trial court was required to impose a $40 fee for each conviction, for a total of $120.

[13]    Under Government Code section 70373, subdivision (a), a $30 court assessment "shall be imposed" on every felony criminal conviction.  One fee of $30 should be imposed for each conviction.  (*People v. Lopez* (2010) 188 Cal.App.4th 474, 480.)  Appellant was convicted of three offenses and the trial court was required to impose a $30 fee for each conviction, for a total of $90.

In its oral pronouncement of judgment, the court imposed the following mandatory fees: ". . . court security fee of $40, $30 felony conviction. . . ." The abstract of judgment for the indeterminate term on count 1 reflects a court security fee (§ 1465.8) in the amount of $40, and a criminal conviction assessment (Gov. Code, § 70373) in the amount of $30. The abstract of judgment for the determinate term on counts 2 and 3 reflects a court security fee (§ 1465.8) in the amount of $80, and a criminal conviction assessment (Gov. Code, § 70373) in the amount of $60.

It is generally true that the oral pronouncement of judgment controls. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) However, when an assessment is mandatory, its "omission may be corrected for the first time on appeal." (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530, citing *People v. Smith* (2001) 24 Cal.4th 849, 852 [sentencing errors "correctable without referring to factual findings in the record or remanding for further findings are not waivable"].) This is true even if the prosecutor failed to object in the trial court. (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157.)

The court security fee and the criminal conviction assessment are mandatory fees and fines and therefore remand is not required. Appellant contends that because "the minutes and abstract already contain the jurisdictionally required fees, no further action is necessary." We note that the two abstracts of judgment refer to each other, and it is unlikely they will be misinterpreted. The abstracts of judgment when combined together reflect the correct amount of fees and assessments, but this requires an additional calculation that can be remedied here.

Accordingly, it is the judgment that must be modified to reflect imposition of court security fees in the amount of $120, and criminal conviction assessments in the amount of $90. The abstracts of judgment shall be amended to reflect the judgment as so modified.

## DISPOSITION

The judgment is modified as follows: the gang-related firearm enhancement imposed under section 12022.53, subdivisions (d) and (e), as to count 2 is stricken; the parole revocation fine pursuant to section 1202.45 is stricken; the restitution order in the

amount of $3,595.33 shall be joint and several; a $40 court security fee pursuant to section 1465.8 should be imposed on each count, for a total of $120; a $30 court construction assessment pursuant to Government Code section 70373, subdivision (a) should be imposed on each count, for a total of $90; and appellant is awarded 1,176 days presentence custody credit.

The clerk of the superior court is directed to prepare amended abstracts of judgment reflecting these modifications and to forward a certified copy of the amended abstracts to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


FERNS.J.*

We concur:


ASHMANN-GERST, Acting P.J.


CHAVEZ, J.

_____

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.